SOUTHERN STEEL & IRON CO. v. HICKMAN, WILLIAMS & CO. et al.

(Circuit Court, N. D. Alabama, S. D.   October 5, 1911.)

No. 1,291.

1. SALES (§ 81*)—CONTRACT—CONSTRUCTION—"SHIPMENT."

Plaintiff's assignor purchased from defendants 300 tons of English ferro-manganese iron' by a written order providing for "shipment," 100 tons each in September, October, and November. Defendants immediately contracted with an English concern to ship the ore, their contract with plaintiff providing for "shipments," as distinguished from "deliveries," in September, October, and November, their contract with the English sellers requiring deliveries in New Orleans in October, November, and December. Held, that the word "shipment," as used in the contract of sale, did not mean "delivery," and, that shipment of 100 tons having been made in September, there was no breach of contract by failure to deliver such amount in that month.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 217–223;  Dec. Dig. § 81.*

For other definitions, see Words and Phrases, vol. 7, p. 6489.]

2. BANKRUPTCY (§ 114*)—CONTRACTS—BREACH—WAIVER.

Plaintiff's assignor prior to bankruptcy purchased from defendants 300 tons of English iron to be shipped in September, October, and No-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

vember, 1907. The first 100 tons arrived October 7, 1907, and, bankruptcy having intervened before delivery, the buyer's receivers sent defendant an order for the 100 tons, which recited that such order substituted the order given by the bankrupt for 300 tons. The quantity and terms of payment were different, but in other respects the orders were identical. The receivers finally refused to receive the remaining 200 tons. *Held*, that the receiver's action in accepting the 100 tons did not relieve the bankrupt's estate from liability for breach of contract as to the balance, nor did the substitution of the orders operate to discharge the estate from such liability.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 114.*]

At Law. Action by the Southern Steel & Iron Company against Hickman, Williams & Co. and others. Defendants pleaded an offset, and paid the balance of the claim. Offset allowed, and judgment against defendants, for costs.

Campbell & Johnston, for plaintiff.
Tillman, Bradley & Morrow, for defendants.

GRUBB, District Judge. This is a suit in assumpsit by the plaintiff, as transferee of a claim of the Southern Steel Company, its predecessor, against the defendants. The defendants owed the Southern Steel Company the balance of an account as its selling agents at the time of its bankruptcy, approximately $3,300. They claimed an offset to this amount by virtue of a claim for damages for breach by the Southern Steel Company of a contract of purchase of 300 tons of iron, of which only 100 tons were accepted under the contract. The conceded amount of the offset, if allowed, is $2,610, and the balance of the account has been paid by defendants since the institution of this suit. A finding for plaintiff on that issue would call for a judgment in its favor for the amount of the offset and costs, and a finding against the plaintiff would entitle it to a judgment for costs only. The case was submitted to the court without a jury upon a stipulation also setting out the agreed facts on which judgment was to be rendered. Two questions are controlling of the decision: The construction of the original order of the bankrupt for 300 tons, as to the time of its fulfillment; and the construction of a subsequent order given by the receivers, as to whether it operated to release any cause of action the defendants had for breach of the contract evidenced by the original order and its acceptance.

[1] The Southern Steel Company, through its purchasing agent, ordered over the telephone from the defendants, who were iron commission men, 300 tons of English ferro-manganese iron. On the same day the defendants wrote the Southern Steel Company a confirmation of the acceptance of the order, and forwarded to them a form of contract, embodying the terms of the order as they understood them. On the same day the Southern Steel Company also mailed defendants a form of order, embodying the conditions of the telephonic order, as understood by it. These letters crossed each other in transit. The Southern Steel Company accepted in writing the contract sent it by defendants. The defendants did not sign an acceptance of the form of order sent them by the Southern Steel Company. The contract which was signed

by both parties to the transaction provided for shipment of the 300 tons ordered, 100 tons each in September, October, and November. The form of order which was prepared by the Southern Steel Company and transmitted by it to defendants, but not signed by them, called for September, October, and November deliveries in equal proportions. The telephonic order was silent as to time of shipment or delivery. The question in controversy involves the construction of the sale contract as to the time of delivery required by it. The plaintiff contends that a proper construction of the contract required deliveries to be made under it in equal quantities in September, October, and November. The defendants contend that it required only that the iron should be shipped from point of origin in equal quantities during those three months. Shipments were made from the English point of origin in September, but no iron was offered for delivery to the Southern Steel Company at the plant, nor did any arrive in this country until October. A breach of contract is predicated on this delay, and plaintiff relies on it to defeat defendants' claim for damages arising out of the subsequent failure of the Southern Steel Company and its receivers and trustees in bankruptcy to accept and pay for 200 tons of the iron ordered by it.

If the contract, properly construed, did not require September delivery for the first 100 tons of iron, the defendants did not breach their contract. One hundred ton shipments were made in both September and October. It is clear that the binding contract of sale was the written contract, prepared and signed by defendants, and forwarded to and accepted by the Southern Steel Company. In this contract the word "shipment" is employed to express the terms as to delivery. Defendants' letter acknowledging the order of the steel company and their letter inclosing the form of contract adopted each employs that word. The form of order sent to defendants by the steel company, but which was never acted upon, employed the word "deliveries." If the two words differ in meaning, it is clear that the word employed in the contract adopted by both parties must govern. That the words "September shipment" have a different signification from the words "September delivery" is indisputable. The former requires only that the seller start the iron on its journey to the purchaser during that month. The latter exacts of the seller completion of the journey and the turning of it over to the purchaser during the same period. The defendants in this case, at least, seem to have employed the term advisedly. The stipulation shows that the sellers were not the manufacturers of the commodity sold. They had to purchase it to fill their sale contract and in a foreign country. Acting in view of this necessity and of the consequent long journey and uncertain transportation, it was only natural for them to decline to assume the risk of carriage. The contract which defendants made with Crocker & Co. to enable them to comply with their contract with the steel company shows that they understood the latter to require of them September, October, and November shipments only, and not similar deliveries. That contract provided for October, November, and December deliveries at New Orleans by Crocker & Co., and its terms in this respect could not have enabled defendants to have carried out their contract with the steel company, as construed by

plaintiff, since Crocker & Co. were not obliged to deliver any iron in this country until October, and hence defendants could not have insisted on delivery to them of any iron under it in time to have enabled them to deliver it to the steel company at its plant in Alabama in September. It is hardly credible that defendants would have made such a contract with Crocker & Co. to enable them to fulfill their contract with the steel company if they had construed the latter as plaintiff contends it should be construed. This is convincing that the defendants used the word "shipment" in its ordinary acceptation, and whatever may have been the understanding of the steel company as to its signification, if it differed from its ordinary acceptation and was not shared in by defendants, it could not control the construction of the contract.

Entertaining this view of the construction of the contract, it is not necessary to consider the right of the Southern Steel Company to declare the contract terminated because of a delay in shipment, or the question as to whether it had waived such right, if it existed.

[2] The plaintiff also contends that the claim of defendants for breach of sale contract, if they had any, was compromised by a subsequent agreement between the receivers in bankruptcy of the Southern Steel Company and the defendants. The order for the iron in controversy was given July 26, 1907. The first 100 tons were shipped from England on September 13, 1907, arriving in New Orleans October 7, 1907. On October 24, 1907, an involuntary petition in bankruptcy was filed against the Southern Steel Company, and on the next day receivers were appointed and were authorized to continue the business of the bankrupt. Correspondence was entered into between the defendants and the receivers or their agent regarding the acceptance and disposition of the iron, then in New Orleans. On November 14th the receivers, through their agent, sent defendants an order for the 100 tons in New Orleans, which recited that "this order substitutes order 4898 given by the Southern Steel Co.," which was the original order for the 300 tons purchased by that company. The quantity and terms of payment expressed in the latter order were different from those of the original order, but in other respects it duplicated that order. Upon this order the 100 tons in New Orleans were delivered to the receivers at their plant in Alabama. The receivers, after operating the plant for a short time, decided to shut it down. This took away their opportunity to use the iron ordered by the bankrupt of defendants. The receivers consequently declined to accept the remaining 200 tons, and asked the defendants to sell the 100 tons which they had already accepted for their account. The contention of the plaintiff is that the order of the receivers, which was acted upon by defendants, constitutes a release of the estate from damages for the breach of the sale contract by the bankrupt, upon the idea that the defendants accepted the agreement of the receivers to take the 100 tons already in New Orleans in full satisfaction of the original order, basing their contention on the language of the "second order," "this order substitutes order 4898 given by the Southern Steel Co." Of the remaining 200 tons 100 tons were shipped to defendants from England October 11, 1907, and 100 tons October 19, 1907, arriving at New Orleans, respectively,

November 1, 1907, and November 6, 1907, and were afterwards sold by defendants on the market at less than the contract price.

The receivers had the right to adopt the bankrupt's contract or reject it, as burdensome, leaving the other party to his claim against the estate for its breach. If the receivers had continued to operate the plant and in its operation had required the amount of iron contracted for by the bankrupt or part of it, it would probably have been to the interest of the estate to take from the defendants the whole or part of the iron, and to that extent relieve the estate from defendants' claim for its breach. When the receivers ceased operations and required no more iron, their interest in the adoption of the onerous contract was at an end. Their adoption of it in that event would have been detrimental to the estate, for the claim would in that way have been paid in full by the receivers, instead of pro rata with the other creditors. Acting upon this idea, the receivers agreed to receive the first 100 tons, which they thought they could use, at the contract price, though it then exceeded the market price. To protect the estate against loss from so much of the original order as was thus accepted, the receivers' order recited that the 100 tons, so ordered by them, were to be accounted as part of the original order, given by the bankrupt, and not as a new and additional quantity. The receivers were interested primarily in getting iron for use in their operation of the plant and incidentally in releasing the bankrupt estate pro tanto from defendants' claim. The jurisdiction of the receivers to treat with defendants arose solely from their need of this iron. As receivers, they had no authority to compromise claims against the bankrupt estate. Their action in so doing independently of their need for the iron would not have been binding upon the trustee. In trading for this iron, it was competent for them to incidentally protect the estate by making the amount received apply on the original order. This being the extent of their jurisdiction and authority in the premises, the parties will be held to have negotiated within these limitations, of which knowledge is imputed to them. It is clear that defendants dealt with the receivers as a separate entity from the bankrupt in accepting the new order, and not as one authorized to compromise the claim for it. The object of both parties was to arrange for the delivery of the 100 tons then supposed to be needed by the receivers, and which had been thrown back on defendants by the bankruptcy upon equitable terms. It was equitable if the receivers took the iron and paid defendants the price specified on the original order that the iron so received should be credited upon the original 300 tons, relieving the estate to that extent from defendants' claim. The language of the receivers' order, construed in the light of the situation of the parties and the subject-matter and the purpose of the negotiations, means that the receivers' order for 100 tons was to be substituted for that amount of the iron agreed to be purchased by the bankrupt and from the defendants. The release of the liability of the bankrupt estate for the difference in price of the balance of undelivered iron was a subject-matter with which the receivers were not then concerned, and with reference to which there was no purpose on their part to contract. The language of the con-

tract is easily susceptible of a construction that would thus limit it, viz., that it was a substitution of the 100 tons ordered by the receivers pro tanto upon the order of the bankrupt without any stipulation as to the rest of the iron, either as to its future delivery to the receivers, or as regarding the claim of defendants against the bankrupt estate if the receivers declined to receive it. The subsequent correspondence shows that this was the interpretation placed on it by the defendants, and, if not with the acquiescence of the receivers and trustees, at least not against their express protest until long after the claim had been presented to them and declined on other grounds.

Counsel for the plaintiff makes no insistence based upon the non-provability of the offset as a claim against the estate in bankruptcy.

The result arrived at requires under the terms of the stipulation a judgment against the defendant for the costs of the suit only.